# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CARMENLITA RIDOUT,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | 2:09cv1669 |
| **MICHAEL J. ASTRUE,** ) | **Electronically Filed** |
| **COMMISSIONER OF SOCIAL SECURITY,** ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

## MEMORANDUM OPINION

December 2, 2010

## I.    INTRODUCTION

Plaintiff, Carmenlita Ridout ("Ridout"), brings this action pursuant to 42 U.S.C. § 405(g),

seeking judicial review of the final determination of the Commissioner of Social Security

("Commissioner") denying her applications for Supplemental Security Income ("SSI") and

disability insurance benefits ("DIB") under Title II and Title XVI of the Social Security Act

("Act")[42 U.S.C. § § 401-433,1381-1382f].  Before this Court are cross-motions for summary

judgment filed pursuant to Rule 56 of the Federal Rule of Civil Procedure.  The record has been

developed at the administrative level.  For the foregoing reasons, this Court will **DENY**

Commissioner's Motion for Summary Judgment (Doc. No. 10) and will **GRANT** Plaintiff's

Motion for Summary Judgment (Doc. No. 8).  The case will be remanded for further proceedings

consistent with this opinion.

## II.    PROCEDURAL HISTORY

Ridout proactively filed for DIB and SSI on October 2, 2006, alleging disability as of July 17, 2006.  (Record of *Ridout v. Astrue*, 09-1073, 62, 78)( herein after "R.").  Ridout alleged disability due to hip bursitis, migraines and injuries from a motor vehicle accident.  (R. 12).  The applications were administratively denied on February 28, 2007.  (R. 41, 46).  Ridout responded by filing a timely request for an administrative hearing.  (R. 114).  On July 31, 2008, a hearing was held before Administrative Law Judge John T. Porter ("ALJ").  (R. 25-37).  Ridout, who was not represented by counsel, appeared and testified at the hearing.  (R. 26-37).  There was no vocational expert ("VE") present.  (R. 25-37).

In a decision dated September 2, 2008, the ALJ determined that Ridout was not "disabled" within the meaning of the Act.  (R. 10-16).  The Appeals Council denied Ridout's request for review on November 2, 2008, thereby making the ALJ's decision the final decision of the Commissioner in this case.  (R. 1-3).  Ridout commenced the present action on December 18, 2009, seeking judicial review of the Commissioner's decision.  (Doc. No. 1).  Ridout and the Commissioner filed motions for summary judgment on May 12, 2010, and June 11, 2010, respectively.  (Doc. Nos. 8 & 10).  The motions are now before the Court.


## III.    STATEMENT OF THE CASE

The documentary evidence indicates that Ridout suffers from multiple impairments.  On July 17, 2006, Ridout's alleged disability onset date, she was involved in a motor vehicle accident.  (R. 82, 130).  Ridout was the driver of one of the vehicles involved in the accident.  (R. 129).  As a result of her injuries, Ridout was hospitalized for four days and treated for fractured ribs, fracture of the third metacarpal base in the left hand and right pneumothorax.  (*Id.*).  A CT

scan of her chest, abdomen, and pelvis showed a pneumothorax on the right anterior basilar and

two lateral lower rib fractures. (*Id.*). Ridout complained of left hand pain and an x-ray showed

subtle lucency at the base of the third metacarpal fracture. (R. 137, 130). Ridout tested positive

for cocaine at the time of the accident. (R. 137).

On December 28, 2006, at the request of the state agency, Ridout underwent a

consultative medical examination by Lawrence Rahall, D.O.. (R. 144, 148). Ridout was not

observed to be in acute distress, but "walked to and from the examination office with a slight

waddle to her gait favoring her right groin." (R. 146). Dr. Rahall observed that Ridout had

normal internal and external rotation of the flexion and extension of the left hip and the knees.

(R. 147). Ridout complained to Dr. Rahall of continued "discomfort in the right side of her

chest, the upper portion of her back, at the base of her neck and right groin pain." (R. 144). Dr.

Rahall noted that Ridout's rib pain was "gradually subsiding" and that her collapsed lung had

"completely healed." (R. 144, 146). However, Dr. Rahall noted that Ridout's rib and right

groin pain limited her ability to stand. (R. 144). Dr. Rahall concluded that Ridout's pain limited

her to standing for 30 minutes. (R. 144-45).

Dr. Rahall observed abnormalities in Ridout's left arm and hand. Dr. Rahall noted that

Ridout had left hand pain and weakness and was attending physical therapy once a week. (R.

144). Ridout had "some decreased extension to 45 degrees" in her left hand. (R. 147). Her left

hand grasp was approximately 50% of normal and her left forearm strength was fifty percent in

comparison to her right forearm. (*Id.*). Specifically, Dr. Rahall noted that Ridout had difficulty

lifting anything greater than ten pounds or holding any object that has weight in her left hand.

(R. 145). Ridout was noted to have "normal opposition of her fingers" and "no localized pain to

palpation in the wrist area or in the bones of the hand." (*Id.*). However, Dr. Rahall noted that Ridout has "a difficult time lifting objects with her left arm due to left hand pain." (R. 145).

Dr. Rahall completed a medical source statement which noted that Ridout should be limited to only minimal pushing and pulling. (R. 149). Dr. Rahall also indicated that Ridout could only occasionally bend, kneel, stoop, crouch, balance or climb. (R. 149-50). Ridout was also noted to have "affected" reaching, handling, fingering, and feeling. (R. 150). Furthermore, Dr. Rahall expressed that Ridout should avoid heights, moving machinery, and vibration. (*Id.*).

On January 10, 2007, Ridout was examined by William Greer, M.D.. (R. 154). Dr. Greer noted that Ridout ambulated "with some antalgia favoring the right lower extremity." (R. 154). Ridout continued to complain of right groin pain, thigh pain, and a "minimal amount of back pain." (R. 154). Ridout's lumbar spine examination revealed a full range of motion. (*Id.*). X-rays did not show evidence of acute injury and showed adequate maintenance of the joint space. (*Id.*). Dr. Greer noted "some right-sided paraspinal tenderness." (*Id.*). Dr. Greer assessed "right hip pain" and planned to offer a steroid injection if an upcoming MRI-arthogram didn't show intra-articular pathology. (R. 155).

On January 30, 2007, Ridout was seen by Mark Baratz, M.D., a treating physician at the Human Motion Center. (R. 155). Dr. Baratz noted "no lifting, no carrying", "no pushing or pulling", "no balancing" and "no climbing" because of Ridout's impairments. (R. 165). Dr. Baratz was awaiting results of the ordered MRI-arthrogram as he noted next to these limitations, "MRI-arthrogram needed & ordered." (*Id.*). Dr. Baratz noted that Ridout could frequently perform all postural activities except for climbing and didn't assess any other physical or environmental limitations. (R. 166).

Ridout was seen by Dr. Greer a second time on April 25, 2007, to review the results of her MRI-arthrogram. (R. 181). Dr. Greer described the results as reflecting "some evidence of labral fraying" but "no occult fracture or frank labral tear. (*Id.*). Dr. Greer diagnosed Ridout with hip bursitis and proceeded to treat her with injections. (*Id.*). On October 15, 2007, Ridout told Dr. Greer the injection in April helped her for approximately three months, but the pain had been increasing. (R. 180). Since Ridout indicated that she was having renewed difficulty with hip pain, Dr. Greer administered another injection. (*Id.*).

On February 23, 2007, Brian Geho, a non-physician disability adjudicator found that Ridout was limited to an occasional ability to climb stairs, balance, stop, kneel, crouch and crawl. (R. 170-71). Mr. Geho also noted Ridout's limited ability to push and pull in the upper extremities, handle with the left hand, or finger with the left hand. (*Id.*). He also concluded that Ridout had no ability to climb ropes or scaffolds. (R. 170).

Ridout was also treated by physiatrist John A. Magnotta, M.D. On October 2, 2007, Dr. Magnotta performed an upper extremity neurologic examination. (R. 185). Dr. Magnotta's examination revealed "grasp, hand intrinsic, wrist extensors, elbow flexion extensors, and shoulder abductors to be 5/5." (*Id.*). Ridout had tenderness along the right medial scapular border, full bilateral shoulder abduction and forward elevation but no cervical spine motion restrictions. (R. 184-85). Dr. Magnotta's impression was that Ridout "may have a component of right scapulothoracic dysfunction, perhaps in relationship to her rib fractures, also a component of myofascial pain." (R. 185).

On October 25, 2007, Dr. Magnotta noted normal radiographs of Ridout's right shoulder. (R. 184). Dr. Magnotta's impression was that his "evaluations have demonstrated left thumb CMC joint arthritis and right trochanteric bursitis. It is my impression that she may have a

component of right scapulothoracic dysfunction with some secondary myofascial pain." (R. 183). Dr. Magnotta planned to send Ridout to physical therapy for three weeks. (*Id.*). Dr. Magnotta also wrote Ridout a prescription for TheraCare. (*Id.*).

On May 19, 2008, Dr. Greer wrote a letter addressing his treatment of Ridout's hip bursitis with injections. (R. 179). Dr. Greer wrote that Ridout had "two hip injections up to this point, which has helped her for a considerable amount of time." (*Id.*). Dr. Greer stated that Ridout may require future injections and he would continue to treat her for hip pain. (*Id.*).

On June 23, 2008, shortly before her hearing, Ridout went to an Emergency Room at the Medical Center of Aurora, Colorado. Ridout testified she was on vacation and needed to be taken to the emergency room for her migraine. (R. 33). Records from this visit demonstrate that Ridout was evaluated for migraine headache with aura and discharged with instruction to continue on current medications and to go to the emergency room if there was "a return of vomiting, numbness or visual disturbances." (R. 186).

At the hearing, Ridout testified that following her car accident, she was no longer able to perform the functions of her previous job as a cleaner at Robert Morris University. (R. 31-32). She testified that she had returned to the job following her accident, but after a month and a half Robert Morris University had terminated her because she was unable to perform her duties. (R. 32). Ridout testified that following her termination she worked full-time from January to May 2008 making security sensors. (*Id.*). Ridout characterized that she was fired from the position because she called off several times due to migraine headaches. (R. 33).

Ridout also described her impairments at the hearing. She testified that she wakes up every day with a headache and gets migraines two to three times a month. (R. 33). Ridout also testified that her hip hurts and although the injections she is given helps for two months, the pain

returns. (R. 34). She testified that if she walks for more than a block and a half or sits for more than half an hour, her pain becomes a problem. (*Id.*). Ridout also testified that she has a back problem which causes her pain and makes it hard for her to get out of bed. (R. 35).

As to her daily activities of living, Ridout testified she lives with her son and husband who does not work outside of the home. (R. 35). Ridout testified that her son does the laundry, because she couldn't carry the basket up and down the stairs. (*Id.*). She also testified that she does not cook, but probably could. (R. 36). Ridout testified that she drives "back and forth to the grocery store and to church." (*Id.*).

## IV.    STANDARD OF REVIEW

This Court's review is limited to determining whether the Commissioner's decision is "supported by substantial evidence." 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994). The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir. 1986). Congress has clearly expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial

evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Sec'y of Health, Educ. & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively delegated rule making authority, has promulgated a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act. The United States Supreme Court recently summarized this process as follows:

8

If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further. At the first step, the agency will find non-disability unless the claimant shows that he is not working at a "substantial gainful activity."[20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

In an action in which review of an administrative determination is sought, the agency's decision cannot be affirmed on a ground other than that actually relied upon by the agency in making its decision. In *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194 (1947), the Supreme Court explained:

When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196.

The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision.

## V.    THE ALJ'S DECISION

In his decision, the ALJ determined that Ridout had met the insured status requirements of the Act through December 31, 2010. (R. 12). The ALJ found that Ridout had not engaged in substantial gainful activity since July 17, 2006, the alleged onset date. (*Id.*). Ridout was found to be suffering from hip bursitis, migraines and status post injuries sustained in a motor vehicle accident (fractured left hand and ribs). (*Id.*). Although these impairments were found to be "severe" within the meaning of 20 C.F.R. § 416.920(a)(4)(ii), they did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listing of Impairments" or, with respect to a single impairment, a "Listed Impairment" or "Listing"). (R. 12-13). The ALJ found that Ridout had the residual functional capacity ("RFC") to perform sedentary work with no limitations. (R. 13-14).

Ridout was born on August 3, 1960, making her forty-five years old as of her alleged onset date and forty-eight at the time of the ALJ's decision. (R. 14-16). She was classified as a "younger individual" under the Commissioner's regulations. 20 C.F.R. §§ 404.1563, 416.963. She has a high school education and the ability to communication in English. (R. 15) 20 C.F.R. §§ 404.1564, 416.964. The ALJ concluded that based on Ridout's age, education, work experience and residual functional capacity to perform the full range of sedentary work, there are jobs that exist in significant numbers that Ridout can perform. (R. 15). Therefore, the ALJ

concluded a finding that Ridout was "not disabled" from July 17, 2006, through September 2, 2008, was directed by Medical-Vocational Rule 201.21. (*Id.*).

## V.    DISCUSSION

Ridout assails the ALJ's finding that she was capable of performing "sedentary work" without additional limitations[1]. (Doc. No, 9, 6). In support of her motion for summary judgment, Ridout argues that the ALJ erred in failing to discuss "the 14 non-exertional functional limitations documented by Dr. Baratz, her treating physician at the Human Motion Center, Dr. Rahall, the consultative examiner, and Brian Geho, the DDS adjudicator." (*Id.*). Ridout argues that this omission led to the ALJ's failure to give a detailed "function-by-function" assessment of her residual functional capacity which necessitates her case be remanded for further proceedings. (*Id.*). The Commissioner contends that the ALJ's decision is supported by substantial evidence. (Doc. No. 11, 12).

The Commissioner defines non-exertional limitations as those limitations, which do not per se limit exertion, but which result in job related limitations. Examples of non-exertional limitations include mental impairments, postural-manipulative impairments (such as limitations in stooping, kneeling, crouching, reaching, handling, fingering and feeling), hearing impairments, visual impairments, and environmental limitations. Social Security Ruling, 83-12; 20 C.F.R. 404, Subpt. P, App. § 200.00(d), (e).

---

[1]  Sedentary work is defined by the applicable regulations, 20 C.F.R. § 416.967(a) . "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."

In the present case, the ALJ improperly rejected medical evidence of record documenting Ridout's non-exertional limitations. An ALJ is free to choose between conflicting medical evidence of record, but "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). The ALJ improperly rejected medical evidence of Ridout's left hand impairments to conclude that her limitations "are <u>mild</u> if any" based solely on the ALJ's lay opinion and speculations. (R. 15). This was error. *Adorno*, 40 F.3d at 47.

Dr. Baratz, Ridout's treating physician at the Human Motion Center, noted that Ridout's impairments limited her to no lifting, carrying, pushing or pulling. (R. 165). A treating physician's opinion is afforded great weight. *Morales*, 225 F.3d at 317. Indeed, the United States Court of Appeals for the Third Circuit has emphasized that a treating physician's opinion regarding a claimant's ability to work is entitled to substantial weight. *See Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981). More recently, the Court recognized that this is "(the) cardinal principle guiding disability eligibility determinations." *Morales*, 225 F.3d at 317. This principle is especially true when the treating physician's opinion reflects "expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales*, 225 F.3d at 317, citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999).

In 2008, the United States Court of Appeals for the Third Circuit in *Brownawell v. Comm'r*, 554 F.3d 352 (3d Cir. 2008), reiterated the "treating physician rule[2]." The Court reversed and awarded plaintiff benefits, holding that the ALJ's decision was "clearly erroneous"

---

[2] The opinion in *Brownawell* is not a precedential opinion under United States Court of Appeals for the Third Circuit operating procedure Rule 5.7 and as such is not binding precedent for this Court. *Brownawell*, 554 F.3d 352. However, it has been cited and followed by other Courts in the Western District of Pennsylvania. *See Knox v. Astrue,* 2010 U.S. Dist. LEXIS 28978 (W.D. Pa. Mar. 26, 2010), *Lehman v. Astrue,* 2010 U.S. Dist. LEXIS 48783 (W.D. Pa. 2010), *Adriondo v. Astrue*, 2010 U.S. Dist. LEXIS 21313 (W.D. Pa. Mar. 9, 2010).

and was not supported by substantial evidence because the ALJ failed to give appropriate weight to the opinions of the claimant's treating physicians which were confirmed by a consultative examiner. *Brownawell*, 554 F.3d at 355. The ALJ in *Brownawell* relied on opinions of the State Agency physician as a basis to deny benefits. *Brownawell,* 554 F.3d at 361. The United States Court of Appeals for the Third Circuit rejected this reliance noting that "this Court has consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who does not examine the claimant when such testimony conflicts with testimony of the claimant's treating physician. *Brownawell,* at 361(internal quotations omitted) citing *Dorf v. Comm'r*, 794 F.2d 896, 901 (3d Cir. 1986).

In the present case, the ALJ briefly noted Dr. Baratz's restrictions, but characterized the limitations as "claimant should not lift, carry, push, or pull until an MRI was obtained due to continued wrist pain and x-rays revealing an irregularity on the lunar aspect of the lunate." (R. 14). Dr. Baratz's medical source statement noted that Ridout should not lift, carry, push or pull with the added notations "MRI-arthrogram needed and ordered." (R. 165). This is not, as the ALJ stated, indicative that Ridout would only be limited in those aspects until an MRI was reviewed, but rather an indication that Dr. Baratz wanted further testing in that respect. Sedentary work by definition may involve lifting or carrying and thus the ALJ's RFC failed to incorporate a limitation noted by Dr. Baratz, one of Ridout's treating physician. 20 C.F.R § 416.967(a).

There is no further medical record evidence from Dr. Baratz following review of Ridout's MRI to indicate if the results would have varied Ridout's noted limitations. However, the ALJ examined the results of the MRI arthrogram and concluded that the results were "<u>mild</u>." (R. 14). This was an error because an ALJ may not make "speculative inferences from medical reports."

*Adorno*, 40 F.3d at 47. The ALJ is not a medical doctor and may not infer Ridout's limitations from her medical reports. *Id.* Furthermore, rather than discrediting Dr. Baratz's notations, the MRI results are objective medical tests which may corroborate his findings. Ridout's MRI results indicated left wrist pain as well as bone marrow edema. (R. 176-77). The ALJ improperly concluded that the MRI results were mild and rejected Dr. Baratz's opinion without citing any medical evidence to support this conclusion or rejection. (R. 14).

The United States Court of Appeals for the Third Circuit has consistently recognized that an ALJ may reject the opinion of a treating physician when that opinion is contradicted by other probative medical evidence. *Morales*, 225 F.3d at 317; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). Indeed, a treating physician's opinion must be well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the case in order to warrant controlling weight. *See* 20 C.F.R. § § 404.1527(d)(2); 416.927(d)(2). In the present case, Dr. Baratz's opinion was corroborated by Dr. Rahall's consultative examination and well-supported by subsequent objective medical testing such as Ridout's MRI. (R. 170-73, 176-77). Therefore, his opinion was warranted controlling weight. 20 C.F.R. § § 404.1527(d)(2). However, the ALJ improperly dismissed Dr. Baratz's opinion without citing any contrary medical source or opinion. (R. 14). This was error as an ALJ may not reject the opinions of treating physicians unless those opinions are contradicted by other medical evidence[3]. *Morales*, 225 F.3d at 317.

---

[3] The ALJ found that Ridout's testimony in regards to debilitating pain to be "somewhat exaggerated" and unsupported by the medical evidence and contradicted by her daily activities. (R. 13). This is not the case as the record contains repeated notations of Ridout's pain and she testified to the limiting effects of her impairments. (R. 25-37, 144,185). Furthermore, the medical record demonstrates Ridout has severe impairments not included in her residual functional capacity determination. (R. 13). An ALJ must also give serious consideration to the claimant's subjective

The ALJ also rejected the medical opinion of Ridout's consultative examiner, Dr. Rahall. Dr. Rahall conducted a consultative examination of Ridout on December 28, 2006. (R. 144-152). Dr. Rahall noted that Ridout had "left hand pain and left hand weakness for which she is still going to physical therapy twice a week for heat, hot packs and massage." (R. 144). Dr. Rahall found that Ridout's hand grasp in the left was approximately fifty percent of normal and her left forearm ability was about fifty percent compared to her right forearm. (R. 147). Dr. Rahall further noted that Ridout "has a difficult time lifting objects with her left arm due to left hand pain." (R. 145). He elaborated that although Ridout had a difficult time lifting anything greater than ten pounds with either arm, "she has an increased weakness of the left hand causing her a difficult time holding any object that has weight." (*Id.*). Ridout's left wrist was noted to have decreased extension to 45 degrees, flexion of the wrist 45 degrees. (*Id.*). Inversion and eversion were approximately 10 to 20 degrees. (R. 147).

In his medical source statement of claimant's ability to perform work-related physical activities, Dr. Rahall limited Ridout to standing half-an-hour and walking one block. (R. 149). Dr. Rahall also noted limitations in Ridout's left side including limited lifting and occasionally carrying to ten pounds. (*Id.*). Like Dr. Baratz, Dr. Rahall noted "no pushing and pulling." (R. 149, 165). Furthermore, Dr. Rahall concluded Ridout had other non-functional limitations in reaching, handling, fingering and feeling. (R. 150). Ridout's impairments were also noted to be affected if exposed to poor ventilation, heights, moving machinery, and vibration. (*Id.*).

---

complaints, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir.1993); *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir.1986). In the present case, the ALJ failed to accord Ridout's testimony serious consideration. (R. 13).

The ALJ addressed Dr. Rahall's findings in his decision, but improperly rejected the evidence. The ALJ noted several of Dr. Rahall's observations, such as Ridout's full range of motion, decreased hand grasp and forearm strength on the left, limitations as a result of her left hand injury and limitations in her ability to sit. (R. 14). However, the ALJ failed to mention or address Dr. Rahall's limitations assigned in the areas of pushing/pulling, bending, kneeling, stooping, crouching, balancing, climbing, reaching, handling, fingers, feeling, or limited exposure to heights, moving machinery and vibrations. (R. 149-50).

In making a residual functional capacity determination, the ALJ must consider all evidence of record. *Plummer v. Apfel,* 186 F.3d 422, 429 (3d. Cir. 1999). An ALJ may weigh the credibility of evidence, but must give an indication of the evidence he/she rejects and reasons for discounting said evidence. *Plummer*, 186 F.3d at 429. Otherwise, "in the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. The ALJ did not mention several of Dr. Rahall's assigned limitations which would affect Ridout's ability to perform certain work-related tasks. Without mention of these limitations, this Court can only assume that the ALJ did not consider all of the evidence of record. Therefore, substantial evidence does not support the ALJ's decision. *Plummer*, 186 F.3d 429-30.

Furthermore, the ALJ substituted his own lay opinion for medical opinion in finding "that the claimant in right hand dominant and her limitations appears <u>mild</u> if any. Further, there is no evidence in the consultative examination to support a limitation on the claimant's ability to sit." (R. 14). The ALJ cites no contrary medical evidence to refute Ridout's left hand limitations noted by Dr. Baratz and Dr. Rahall. Instead, he concludes without any support other than his own examination of the MRI and Ridout being left-handed that these limitations will not be

16

included in Ridout's RFC determination. (R. 13-14). This was plainly error. An ALJ's determination of disability must not be based on his own credibility judgments, speculation or lay opinion. *Adorno*, 40 F. 3d at 47. An ALJ may not make speculative inferences from medical reports and is not free to employ her own lay opinion against that of a physician who presents competent medical evidence. *Fargnoli*, 247 F.3d at 37. Indeed, an ALJ is "not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports . . . ." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir.1985). Dr. Baratz and Rahall's specific functional limitations were not the plainly vague conclusory statements that Ridout is disabled or unable to work of the type that the Commissioner may ignore pursuant to 20 C.F.R. § 404.1527(e), 416.927(e)[4]. As in *Brownawell*, the ALJ erred in failing to give appropriate weight to the opinions of the claimant's treating physician which was confirmed by a consultative examiner. *Brownawell*, 554 F.3d at 352. *See also Morales*, 225 F.3d 310. The ALJ's decision is not supported by substantial evidence and must be remanded for further administrative proceedings.

Ridout further argues in support of her motion for summary judgment (Doc. No. 8) that the ALJ erred in determining disability without vocational expert testimony. (Doc. No. 9, 12). Ridout argues this error "at the very least requires remand to obtain necessary Vocational Expert testimony." (*Id.*).

---

[4] Ridout further argues that the ALJ erred in failing to address the limitations noted by the non-physician disability adjudicator, Brian Geho. (Doc. No. 9, 8). However, Brian Geho, a non-physician, does not qualify as an acceptable medical source of evidence of Ridout's impairments. *See* 20 C.F.R. § § 404.1513(a), 416.913(a).

A claimant's RFC is relevant at both the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. § 416.945(a)(5)(i)-(ii). At step four, the ALJ determined that Ridout could not return to her past relevant work as a cleaner. (R. 14). Therefore, the ALJ's analysis proceeded to the fifth step where the ALJ determined that since Ridout could engage in a full range of sedentary work, there were jobs that exist in a significant number in the national economy that Ridout could perform. (R. 15). "At the fifth step, the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003). Where the claimant's RFC is not materially different from that of a large class of individuals, the Commissioner's burden can be satisfied solely by reference to general guidelines such as the Medical-Vocational Rules or Social Security Rulings. *Heckler v. Campbell*, 461 U.S. 458, 467-70 (1983); *Allen v. Barnhart*, 417 F.3d 396, 405-08 (3d Cir. 2005). However, where claimant's RFC is relatively unique, the Commissioner can satisfy his burden only by producing evidence (i.e. vocational expert testimony) establishing the existence of jobs in the national economy that do not require the performance of tasks which are precluded by the claimant's functional limitations. *Sykes v. Apfel*, 228 f.3d 259, 273 (3d Cir. 2000). In this case, the ALJ relied solely on Medical-Vocational Rules 201.21 in determining that Thompson was not statutorily disabled. (R. 15).

According to the United States Supreme Court, the Medical-Vocational guidelines are not applicable in every case, but rather "will be applied only when they describe a claimant's abilities and limitations accurately." *Heckler*, 461 U.S. at 461. In cases in which the grids do not apply because claimant has both exertional and non-exertional impairments, the United

States Court of Appeals for the Third Circuit has held that "the Commissioner must rely upon some other supporting evidence in the record to demonstrate that the claimant can perform work available in the national economy." *Washington v. Heckler*, 756 F.2d 959, 967 (3d Cir. 1985). Despite the Commissioner's argument that there was no medical evidence to establish Ridout had non-exertional limitations, this is not the case. (Doc. No. 11, 18).

Ridout's medical evidence demonstrates that she has limited strength and movement in her left arm which may limit her ability to lift, carry, reach, finger, etc. (R. 149-50,165-66). The ALJ improperly rejected or did not mention medical evidence from Dr. Baratz and Dr. Rahall in determining that Ridout could perform the full range of sedentary work. (R. 14-15). Once Ridout established medically determinable impairments, the burden shifted to the Commissioner to determine if there are a significant number of jobs in the national or regional economy Ridout is capable of performing. *Boone*, 353 F.35 at 205. In the present case, the ALJ failed to include these impairments in Ridout's residual functional capacity and did not rely on any supporting evidence, such as VE testimony to demonstrate Ridout's ability to perform available work. (R. 15). Therefore, the ALJ's decision was not supported by substantial evidence and must be remanded.

In light of the foregoing analysis, the ALJ's decision cannot be affirmed. The only remaining question is whether a judicially-ordered award of benefits is proper, or whether the case should be remanded to the Commissioner for further administrative proceedings. An immediate award of benefits is appropriate only when the evidentiary record has been fully developed, and when the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled. *Morales*, 225 F.3d at 320.

That standard is not met here. There is no medical evidence from a treating physician that addresses Ridout's MRI subsequent to Dr. Baratz's medical source opinion or if her limitations in lifting, carrying, reaching, fingering, etc. remain. Furthermore, there is no VE testimony to determine if jobs exist in substantial numbers in the national economy that Ridout can perform when considering all of her medically determined impairments. (R. 25-37). The ALJ has the option of ordering a consultative examination or examinations to address these issues. In addition, Ridout should be afforded an opportunity to supplement the medical evidence to address her contention that she remains unable to work *See Stover v. Shalala*, 1995 WL 327981 * 8 (E.D.Pa. May 31, 1995)("As 42 U.S.C. § 405(g) clearly provides that a court may allow for a rehearing following remand, a rehearing should be held in order to assist the ALJ in correctly assessing Dr. Miller's last report and the report of Ms. Davidow. Stover should be given an opportunity at this rehearing to submit additional relevant evidence.") *citing Rocco v. Heckler*, 826 F.2d 1348 (3d Cir. 1987)("often a diagnosis or prognosis is necessarily only an educated guess that must await later developments to confirm or disprove the doctor's original impression.")

For these reasons, further development of the record is needed.


## VI.    CONCLUSION

The ALJ's decision in the present case is not supported by substantial evidence. The ALJ improperly rejected the medical limitations noted by Dr. Baratz and Dr. Rahall in favor of his own lay opinion and speculation. (R. 14-15). In improperly rejecting the medical opinions of record, the ALJ failed to include all of Ridout's impairments in the residual functional capacity assessment. The ALJ's decision, therefore, is not supported by substantial evidence.

Further, once Ridout established non-exertional limitations, the ALJ erred in relying solely on the Medical-Vocational guidelines to determine if Ridout can perform jobs which exist in substantial numbers in the national economy. When there are both exertional and non-exertional limitations, the Commissioner must rely upon supporting evidence such as VE testimony to meet his burden that claimant can perform work available in the national economy. *Washington*, 756 F.2d at 967. In this case, the ALJ failed to do so.

For the foregoing reasons, this case will be remanded for further administrative proceedings consistent with this opinion An appropriate order will follow.

s/ David Stewart Cercone
David Stewart Cercone
United States District Judge

cc:     Lee Karl
        Assistant United States Attorney
        Lindsay Fulton Brown, Esquire

        *Via CM/ECF Electronic Mail*